Next case, Madam Clerk. Freeman v. City of Chicago. The lawyers identify themselves. Is everyone here? Good morning. I'm Suzanne Loos. I represent the City of Chicago, the appellant in this case. Good morning, Your Honor. I'm Larry Rogers, Jr. I represent the Freeman plaintiffs, the appellees. Do you have co-counsel with you today? I do. Mary, I'm certainly Casper. Thank you. Ms. Casper will be arguing today as well? No, just me today. All right, thank you very much. We're going to give you 15 minutes for your initial and then another five if you wish to take some more time after that, Ms. Loos. And are we ready to proceed? Good morning, Your Honors. May it please the Court. This case involves an unfortunate fatal accident that occurred when a fleeing criminal sped through a red light at a busy intersection at 76 and State Streets. After a trial, the jury returned a verdict against the City based on Officer Kennedy's efforts to stop the fleeing criminal. This morning, I will explain that the judgment entered on that verdict should be reversed for two reasons. One, because the officer's conduct was not the proximate cause of the accident, and two, because the jury verdict was coerced. Beginning with the issue of proximate cause, we submit that as a matter of law, the sole proximate cause of this accident was the reckless driving of Rodney Jones, the fleeing criminal. They had an expert stating contrary. They had an expert stating contrary, but of course, proximate cause in Illinois has two components, cause in fact and legal causation. Yes, and it's generally a fact issue for the jury, isn't it? Well, there's also a legal component to legal causation. This Court has often found that proximate cause should be decided as a matter of law when the facts do not support any contrary conclusion. We submit this is such a case. Legal causation requires a close connection between the tortious conduct and the injury, and how close is largely a policy judgment about when a defendant should be legally responsible for the injury. And there is a specific line of cases in the area of police pursuits that guides the proximate cause inquiry. This case is highly similar to three, where this Court found proximate cause lacking as a matter of law, based on similar and even lesser distances between a police officer and the fleeing vehicle. For example, in Road v. City of Chicago, the officers were 20 to 25 cars behind when the fleeing vehicle struck a pedestrian. And in Morton v. Nelson, the officers were one to two blocks behind when the accident occurred. That sort of distance undermines the close connection required for proximate causation. Although those cases really turn on whether there's a link between the conduct that is willful and wanton and the accident, that there has to be that causal link, which did not occur in that case. Whatever the police were doing wrong, it's not what caused the accident. Whereas in this case, the jury found that what the police officers were doing wrong did cause the accident. Well, I mean, that is inquiry, whether the officers' conduct caused the accident that occurred. It's not just whether the conduct caused it, but whether the willful and wanton conduct caused it. Whether the willful and wanton, but there are two separate inquiries, whether there's willful and wanton conduct and whether that conduct caused the accident. And here we submit that it did not as a matter of law. These are cases like Wade and Nelson and Morton where this should be decided as a matter of law. Here, the incident, if I can explain the facts, the incident began on 78th Street after Officer Kennedy had unsuccessfully signaled for the SUV to pull over. The SUV speeds away and Officer Kennedy follows. And he keeps claiming he wasn't pursuing the car. He does, even if you accept that he was pursuing the car. And even if you accept that his conduct amounted to conscious disregard for the safety of others, as the jury concluded, that part we don't dispute for purposes of appeal, that conduct all occurred on 78th Street significantly before the accident occurred. And what the record shows is while the officers are still on 78th Street, they lose sight of the SUV when it's still four blocks ahead and turns right onto State Street. And at that point, the officers resume normal driving, turn off their lights and siren. They're driving with the flow of traffic. And the plaintiff has not disputed the testimony about this four-block distance between the officers and the SUV when the officers lose sight of it. Well, I understand you, and tell me if I'm wrong, that within 30 seconds of the accident, according to the camera, the officers appeared. Is that correct? So I don't know if they were four blocks behind, but they got there pretty quickly. Well, there's no just—the officers' testimony that there was a four-block distance at that point was—is not disputed. And the 30 seconds was actually a pretty significant time. If you watch the video, there was a considerable— it's not as if the officers were on the heels of the vehicle when this accident occurred. There were several—there were cars going in and out of that exchange several times, and then you see a full 30 seconds later, the officers proceeding slowly into the intersection. This is nothing like, for example, the case of Swaranski, where you have an extended chase and the officers are on the heels of a vehicle, watching debris falling off, anything like that. The officers are still a good piece behind. And so the officers were several blocks behind, and then the accident occurred. On these facts, we submit the officers did not proximately cause the accident. Are you saying— Are you focused on the cause? In fact, are you focused on the foreseeability, the proximate cause? Well, I'm—for this, I'm talking about the legal causation. That is, as I said, you need a close connection between the officers and the accident. Rather than proximate, whether there's any foreseeability. You're just saying there's— Well, I said there is a foreseeability that the officers' conduct, which was everything that has been emphasized by my opposing counts about what was worth or wrong, occurred on 78th Street. And I would submit that is not a close enough connection. That's a legal causation question because it is too disconnected from the accident, from the decision that the fleeing suspect made as he drove through that red light on his own, without the officers, like, right on his tail. This is not a situation where the officers were making or prompting that decision to run the red light. Jones alone made that decision, and that makes this case much like Wade's and Norton, and—Wade—I'm sorry, I misspoke—Wade and Nelson and Norton. So Wade was approximating the police officers to the fleeing perpetrator at the time that he went through the red light. How far away were the police officers then? We don't know at the time. We don't have any specific testimony about that, but there was a four-block distance at the time that the officers lost sight, and we also know that the officers didn't arrive at the scene for a full 30 seconds after the accident occurred. So we don't know that. Where they were exactly when he went through the red light when things occurred. No, we do not know that, but we can infer—it seems only—it seems pretty clear to me. The officers are—they're not on the tail of the vehicle when the accident occurred. You don't see it in any of the frames. When the accident occurs, you don't see the police vehicle. You don't see it in the seconds just after. Instead, you see it a full 30 seconds later as the officers arrive, and you can hear them on the tape coming up upon the accident has already occurred, and you can also see them slowly proceeding cautiously into the intersection where the vehicles have come to rest. Your testimony is that at that time, 30 seconds before, did they have their lights on and their sirens going? No. The officers testified, and there's no dispute, that when they turned onto State Street, they turned off their lights and siren and proceeded with the flow of traffic, and there's no counter-testimony to that. So, and finally, I would like to note that the officer— that this Court's approximate cause determinations in pursuit cases have been largely informed by an important policy concern—that is important here— that imposing liability under circumstances like these, when a police officer is not even close to the accident, would only incentivize fleeing suspects to continue to drive away as recklessly as possible. Isn't that incorporated into Willful and Wanton, though? Isn't that where the policy considerations should really be put? That unless an officer is acting in a Willful and Wanton manner, there shouldn't be any liability. That approximate cause seems a poorly placed place to put it. Well, I think it applies in both places, and it has been cited by Lou as in Wade and in Morton, where this Court has addressed that policy concern, and not just in the Willful and Wanton context. I think the concern here is the distance. When you have—you might have, you know, a chain of causation where the officers are involved at an early point in a pursuit, but there's still a good distance away when the legal act of a fleeing criminal is the immediate cause of the action. And, you know, for proximate cause purposes, too, even if there had been some Willful and Wanton conduct earlier in the chase, there still needs to be that connection when that decision by the fleeing criminal makes a decision to break a traffic law. But the officer really can't be closely connected with at that point. And what about the jury verdict? I mean, unlike any of the cases except, I think, one of the cases, you had an inconsistent jury verdict, right? You don't have any jury verdict in any of the cases you rely on where the jury has found proximate cause, and we've said no, no, no. Nevertheless, we have several cases, all of these cases, where the proximate cause of termination is made as a matter of law. So the question is really the same based on the facts here. And the cases are highly similar. In fact, I'd submit that the evidence shows a greater distance than the police officers were in the cases of Wade, Nelson, and Morton. When you have a situation where the officers are maintaining a safe distance, the officers weren't there making or prompting Jones to run that red light. Jones alone made that decision. For all those reasons, we do argue that. Sorry. That's okay. Is this your summation? I want to get to the jury. Yes. The issue of the jury. Me too. Okay. We do submit that the plaintiffs failed to establish proximate cause as a matter of law. Now, turning to our second issue, we do also submit that the verdict in this case was coerced. Under the totality of circumstances surrounding jury verdicts, it is clear that the jury verdict was coerced. Under Illinois law, where the circumstances surrounding juror polling show an over-emphasis on or isolation of a juror's dissent during polling, the public courts have reversed. And in particular, I'd like to highlight the Illinois Supreme Court's decision in Kellogg where the court reversed a jury verdict based on the court's repeated questioning of a juror about whether the verdict is hers. This case involves the same kind of and even more extensive questioning of a dissenting juror. Specifically, how did the trial court err in handling the verdict? The trial court erred in handling the verdict in the repeated questioning and the over-emphasis on the juror's dissent. And in particular, jury McConaghy, when questioned as a part of the initial polling, said, quote, no, your honor, end quote, the verdict against the city was not hers. Like the trial court in Kellogg, the court continued to ask if the verdict was hers. Here, four more times, double the number of times that amounted to reversible error. Does Kellogg say what the court is supposed to do is to understand, try to understand what the juror meant? And in Kellogg, the judge just kept asking the same question again and again and again. This judge tried to clarify what the juror meant, didn't he? Well, Kellogg says that the court has to proceed with caution in how you're going to isolate. Really, the ideal situation is when you have a dissenting juror to immediately in some of the similar cases that my opposing counsel decided, like People v. Gunn or People v. Chandler, if you have a dissenting juror, first of all, her answer was unequivocal in that it was not hers. But if you have an unequivocal answer or an equivocal one, the appropriate thing to do is to return the jury to deliberations right away before isolating the juror through repetitive questioning. Counsel, let me ask you. When this juror, who seemed very unequivocal about her response relative to, she was under duress is what her testimony was, is that right? That's what she said, yes. What the court did was continue to ask her again about the verdict, should I would rather it not be. And so the court says, well, I'm specifically asking, do you want this to be your verdict? Your answer is what? No. The court then asked the jurors to return to the jury room not to deliberate. Is that right? Right. The court was talking to lawyers at that time. Right. How long did that take while the court was talking to lawyers? I don't know if we had the, it was a matter of minutes. There was some debate about what the judge should do at that point. But there was no deliberation order. So that was not time spent in deliberating, correct? Right. So then the court brought the jury back out, and at that time did the court say you're going to further deliberate? At that time the court directed the jury to return the next day. Right. So there was no further deliberation on that day at all. Right. So they went home. Right. Would we consider the time that they spent at home to be deliberation? No. No. So the next morning when they got back, what happened? They were directed to deliberate. Right. And how long were they out? Five to seven minutes. Thank you. So it was only five to seven minutes later that this verdict came out, the new verdict. That's correct. And I would submit that that supports, of course, the jury verdict. The very next thing that happened in court after all this emphasis on McConaghy's dissent was that the jury vote changed immediately. And how many pieces of paper did the jurors have to sign in the jury room? They signed the general verdict, and they had two special interrogatories in this case, I believe. So three pieces of paper. Pretty much the amount of time that it would take to sign it. Among 12 people. Right. They had a special interrogatory on the proximate cause issue, didn't they? They did, yes. So just to back up, just to make sure we're clear on the facts, the first question was unequivocal, no, the verdict was not hers. And then worse than that, the court invited her to explain why she had signed the verdict. She had said the verdict was signed under duress. He invited her to explain and then cut her off as she began to talk about pressure in the room. Then the court told the jury, as you just mentioned, that it would be relieved of jury duty. That's in the transcript at 1583. But instead, a few minutes later, the court required the jury to return the next day, and the next day it required them to return to deliberations. And meanwhile, McConaghy's further effort to address the court was rebuffed. Now, of course, we don't suggest that when she asked to speak to the judge ex parte, that should have been allowed. But the next day she was not allowed to address the court either.  She was not allowed to address the court the next day and was told her only recourse was to send a note to the court, as had been done earlier in the trial through the jury for a person. So just to clarify, the two places that you're saying the court erred is in how he questioned this juror, correct? Right. And that he should have declared a mistrial when the jury came back with its verdict? Is that the other error that you think was made? We did argue for a mistrial, and the court denied that. Is there any place other than those two things? The totality of circumstances shows isolation of the jury here. First you have the line of questioning, and then you have that. What should the court have done is my question. The court should have declared a mistrial at that point. At the point of the next morning, at the point today before, at what point? The court could have declared a mistrial at the end of the day after the isolating questioning. We did move for that then. The court could have declared a mistrial after the jury returned five to seven minutes, after five to seven minutes of deliberations at that point. I'm sorry. I want to go back to one quick question on possible cause with my panel's indulgence. Am I correct that Officer Kennedy kept lights on until he turned onto State Street, which was only two blocks from the accident? Is that correct? That is my understanding. His testimony was that he put on his lights and his sirens as he went through intersections. Because he was driving the wrong way down 78th Street, correct? Correct. And then he turned onto State Street two blocks from where the accident occurred. That's where he turned off his lights? Correct. Okay. And sirens? That is my understanding. And he said he drove with the flow of traffic at that point. On those two blocks. Because he was no longer driving the wrong way on a one-way street. He was riding in the same direction as traffic at that point. But turning back again, just to finish up on the juror coercion issue, the Circuit Court, in ruling on the post-trial motions, focused on whether there was any reason to be concerned for the health, safety, or welfare of any jury member. But clearly, those are not the only circumstances where juror coercion arises, as the cases show. There were no safety concerns or threats like that in Kellogg, Bianchi, Friedman, or Branch. And each of those cases involved reversible error. The central concern in each case was the pressure from judicial conduct, including isolation of a dissenting juror during polling. And one last question. So different than those cases, I don't think in any of those cases, you have an overnight reset. Correct. That's true. And do you think that matters at all? I don't believe that matters because, still, the next thing that you have happen in court, after all this emphasis on the juror's dissent, the next thing that happens in court is a return to the jury room to deliberate. I also would submit that she still wanted to address the court about her concerns. She did that the night before. In the morning, and defense counsel asked, said she should be allowed to do so, and the court still did not take that route, declined to do so. And, you know, after more than a day of deliberations before this break, the only additional thing that she had to think about overnight was what had just happened in court, the magnification of her dissenting vote. And, moreover, in the case law, what has mattered is the length of deliberations after the judicial conduct at issue. Should we review everything the court did here under the abuse of discretion standard? Yes, that is the typical standard of review for a motion for a new trial, and we think that is clearly an abuse of discretion under the case law, especially cases like Kellogg and Bianchi, that really stress that isolating a juror's dissent in this manner is reversible error. The jury verdict was not unanimous. We recognize the court was trying to address a tough situation with the dissenting juror, and we don't suggest a bad motive or impartiality or bias. But this court's decisions in Branch and Freeman, for example, made clear that even without that sort of improper motive or any hostility from the judge, a verdict cannot stand where the influence of the court's conduct is the primary factor in the procurement of the verdict. So between the extent of the questioning during juror polling and the quick timing of the verdict, we believe it's clear that the verdict was influenced by what had happened in court with respect to juror McConaughey, and a new trial is warranted, as in Kellogg and Bianchi. All right. Counsel, sum up, please. For all these reasons, we ask that the judgment be reversed and judgment entered for the city or, in the alternative, a new trial granted. Thank you. Thank you very much. Mr. Rogers. Good morning, Your Honors. If it pleases the court, I'd like to begin my argument with the reference in the defense counsel's brief at page 2 where they say we do not challenge for purposes of this appeal that Officer Kennedy broke traffic laws and engaged in a pursuit on 78th Street, nor do we challenge the jury's finding on the special interrogatory that Officer Kennedy's conduct was worth knowing more. Those issues they've removed from dispute and have concentrated the argument on the issue of proximate cause. I submit to you that there is extensive evidence of proximate cause that was rendered by both the defendant officer, Officer Kennedy, as well as our retired police chief expert, Andrew Scott. Specifically and importantly, I'd suggest we introduce the fact that Officer Kennedy had testified in the criminal trial of Mr. Jones and was asked at that trial to identify and describe on a map the route of his pursuit. Is this in the evidence in this case? It is, Your Honor. It's in the record. Do you know where? I do. He described that at volume 14, page 200, trial transcript page 889. Thank you. And he was asked this question. When you were called to testify before the ladies and gentlemen of the jury when someone else was being evaluated for responsibility, you had no difficulty answering and even drawing the map of the route of your pursuit down 78th Street to 76th and State Street. True? State Street. True? Answer, I had no problem giving the path of travel. No. Question, that was in response to a question about describing your pursuit. Correct? Sir? Yes. Answer, that was the prosecutor's question. Yes. The importance of that, Your Honor, and I would point to the Hudson case, when you're dealing with these police pursuit cases and other similar cases, obviously the issue of credibility becomes important. And throughout this case, from the beginning through the end, there was a denial of engagement in a pursuit, a denial of speeding, a denial of things that we think were clearly proven, including violations of the policies, procedures, and general rules of the police department. Now, even at the appeal level, they are conceding their pursuit, and now they are conceding more than one conduct which was denied throughout the case. We fought the case at the summary judgment level where they denied willful and wanton conduct. They denied proximate cause. Those motions were denied with the court deeming a question of fact to exist to be presented to a jury. They presented, after the introduction of plaintiff's evidence in plaintiff's case, a motion for directive finding, arguing no willful and wanton conduct and no proximate cause. Those findings were denied based upon the evidence that was presented. And then at post-trial motion, again, they challenged those issues which were denied. They had not challenged the fact that the summary judgment motion was denied when the court deemed at that point that there was a question of fact to be presented to a jury. And that's exactly what occurred here. The Hudson case is very telling on that point because in Hudson it involved a pursuit. It's Hudson v. City of Chicago at 378 and at 3rd at 373. In Hudson, Officer Lee denied being involved in a pursuit. She testified that she was compliant with traffic laws. She testified that it was the plaintiff's fault for stopping in front of her vehicle that caused the collision, not her actions. And the trial court, I'm sorry, the appellate court stated, and I quote, the jury was free to disbelieve the city's position that Hudson pulled out in front of Officer Lee's vehicle while she was turning into Lane 1 from Lane 2. Likewise, the jury was free to give great weight to Officer Lee's admission that she was not looking at the lane she was going in. And that was the situation the jury was put in when asked to gauge this officer's testimony in the context of admissions he had made in the criminal court proceeding and evidence that he had done a balancing test. You do a balancing test to evaluate whether to continue in a pursuit. He admitted being engaged in a balancing test. He admitted the balancing test required that he not pursue the vehicle. The jury clearly disbelieved him in when he said he didn't pursue this vehicle. I think that's why the city concedes it. But that doesn't establish approximate cause or even cause in fact. Whether he pursued or not, and let's assume he pursued, did that pursuit cause this third vehicle or this other vehicle to hit this pedestrian? I raise that issue because they are relying on Officer Kennedy's testimony to suggest that he stopped the pursuit. To say that he turned the lights off. I don't think they're saying he stopped the pursuit. He turned the lights off, and I think that's undisputed. At 78, when he went onto State Street, he turned his lights and sirens off. So we only have two, you know, the willful and wanton conduct probably occurred before he made that turn. Well, that's what we dispute, Your Honor. They are suggesting that he traveled for approximately a mile down 78th Street, violating traffic laws, speeding, going the wrong way down a one-way street, ignoring an almost collision with Ms. Austin's vehicle, and then all of a sudden, within the last block or two, he began to comply with traffic laws and do everything right. We believe that's inconsistent with the reasonable inference from the evidence that they're conceding. They're conceding willful and wanton conduct. Your Honor's question to me about him turning his lights and sirens off, the only testimony they have on that point is the officers who respectfully lost credibility. They don't have testimony on that point. Right, but what we have is testimony of his conduct throughout the over one-mile period of the pursuit down 78th Street. We also have the fact that he acknowledges and admits that the general order is required when you terminate a pursuit that you stop your vehicle, you call your supervisor, and he admits in his own testimony, he was asked, why do you do that? That's to protect the general public so that the fleeing eluder does not perceive you to be in pursuit of him anymore. So your point is willful and wanton conduct continues.  It continues right up to the moment. He was asked, question, an involved department member determines that a pursuit does not conform to the balancing test as described in items 2 or any restrictions within them. You are supposed to immediately terminate, correct? Answer, yes. Thereafter, at page 840, he was asked, you're required to stop and call your supervisor and notify the Office of Emergency Services of your location so that you're no longer creating the hazard that's causing the vehicle to flee, correct? I'd say that's a reason, yes. That's a very important reason, correct? It's important, yes. And it's important to the general public's safety, correct? Counsel, the violation of the CPD rules is different from when the willful and wanton conduct occurred, is it not?  That's my point. He admits even that he continued to pursue the vehicle down up to 76th Estate. But he's saying not in a willful and wanton manner. Well, no. What I'm saying is we have evidence and they concede willful and wanton conduct and now they want the jury, the court to believe all of a sudden it stopped because he said it. He lost credibility in that point and a reasonable influence is that it continued. Because we see his vehicle, he didn't comply with the general order that says you terminate and stop and call the supervisor. All we have is testimony that respectfully has lost credibility on that point. I'm asking for your understanding of the concession made by the city and when did it occur? When did the concession occur? Yeah. Concession is to willful and wanton. During trial, motion to reconsider, down appeal. In the reply brief. That's what I want to know. When did this occur? Not at trial, not at motion to reconsider. That's correct, Your Honor. It's a moving target here. We tried the case. They didn't submit any special interrogatory attempts to bifurcate causation. They submitted their special interrogatory identifying whether the conduct, the willful and wanton conduct caused the collision and injuries and the jury affirmed that it did. Now they're asking this court to do something that has not been done where it reverses causation where you have not only a jury verdict but also a consistent special interrogatory submitted by the defense. On an argument, they did not respectfully submit to the jury. So for those reasons, I would suggest to you that the evidence does not support, I suggest to you that the evidence is more than sufficient to support causation. As was mentioned earlier during the counselor's presentation, Andrew Scott testified also to the issue of causation. He testified specifically and expressly to his opinion that, and this is at volume 15, page 88, when an officer, a question, why did these general rules and policies require the officer to terminate and stop? Where he is when the balancing test was against pursuit. Answer, specifically when an officer stops, he shuts off his lights and silence, the odds are the individual being pursued is going to see that he's no longer being chased and will probably go back into the mode of traffic or get off the main highway or get off the side street and drive normally. This vehicle ran a red light at 76th Estate when he collided with the plaintiff's decedent. And the officer is acknowledging in his own testimony that he's continued and did not stop and terminate. So we'd suggest that there's more than sufficient evidence to support the issue, the element of causation put before this jury. Is this your issue? Yes, Your Honor. And just for the record, I have other references to establish causation rendered by both Andrew Scott as well as Officer Kennedy. It's replete through the record. On the issue of the juror coercion that has been alleged, I suggest to the court that if you read the case law, the court is supposed to determine whether there's unanimity or some failure to assent to a jury vote. Judge Harmon, in this case, received jury verdict forms. He did exactly as the case law indicates he's supposed to do. He asked each juror at the request of the defense counsels for polling whether it was then and is now their verdict. He received seven assents. One of the assents even was equivocal. He clarified that. And that was the first one. When he got to Ms. McConaughey and she said no, he simply said, this is not your verdict. And then she began to equivocate. Where do we show the equivocation, counsel? The equivocation, and I'll pull out her statement specifically. He asks her, Katherine McConaughey, was this and is this not your verdict? Juror McConaughey, no, Your Honor. He says, this is not your verdict. She says, it was. It wasn't in the beginning. We had to sign the paper at the end because we were totally wouldn't be let out of the room. How does this equivocate? Because she says it was. It was. It was is a yes. Then she says it wasn't in the beginning. He has to probe to explore whether it is. And there are no specific questions that the court is supposed to ask. He is supposed to inquire to determine her intent and her answer. Once he determines that it is not her verdict, he then is supposed to continue polling, which he specifically did in this case. The next issue is determining what to do, either to grant a mistrial or to send the jury back to continue deliberating. Defense counsel and the appellant in this case agrees those are the discretionary choices of the court. Did he do that? Well, yes, he did, Your Honor. He sent them back, right, to deliberate again? Well, to send them back to deliberate, first of all, Your Honor, this happened at about 4.50 at the end of the day. Plenty of juries go late, do they not, counsel? Yes, Your Honor. Secondly, Your Honor, to do that requires that you give the jury fresh jury verdict forms and fresh special interrogatory forms. And there is a challenge by defense counsel to declare a mistrial. So the court released them as he had done consistently throughout the trial, told them to return as he had done consistently throughout the trial. Defense counsel put them right in their motion for a mistrial. The court said he just sent them back to the jury room. I'm sorry? He just sent the jurors back to the jury room. That was just for a matter of moments. Well, I don't know, was it moments, counsel? The jury wasn't deliberating. No, he released them to the jury room. Correct. Which he would have to do in order to require them to re-deliberate because you have to take the time. Require them to re-deliberate is my point. He just sent them back to the jury room. Okay, we're going back to the jury room. Well, because the decision about whether they deliberate or a mistrial is declared is one that will be made outside the presence of the jury. So he sends them out. The parties and the court discuss the issue. Defense counsel wants to bring a motion for mistrial. We need fresh jury verdict forms and special interrogatories. So how long were they out there not deliberating? It was a matter of minutes and they were released as they had been consistently. Two minutes, ten minutes, 20 minutes? I don't believe the record reflects, but they were released consistently. They were there, counsel. I was there. I would say it was a matter of minutes to a half hour or so. It could have been a half hour. They said they're not really knowing what was going on. But, Your Honor, that happens because Well, it's one woman who dissented is still in the presence of all the jurors. The issue of someone's dissent being recognized is something that's a consequence of requesting a poll in and of itself. And the case law is clear that that is not a basis to determine coercion. They need some actual evidence of coercion. They also need to have some actual conduct on the part of the court beyond the jury polling questions. If you look at the cases But again, the isolation of this juror, sitting in that jury room again, 30 minutes you said it could be. I don't know how long it was. Doesn't that contribute to the issue? Your Honor, I am speculating as to the length of time. They had put nothing in the record to describe the length of time. What I'm saying is that they were released at a time consistent with the time they had been released on other occasions. They had sat in the jury room during debates about the admission of evidence of coercion. This is after a juror says this is not my group. It's a different situation. Except that the fact that she dissented in and of itself is not deemed isolation, inappropriate isolation whatsoever. The fact that she dissent from other jurors is the way in which I agree, but then she's back there again for 30 minutes maybe with all these people who she's dissenting against. Respectfully, I think that that is not how isolation is defined within the case law. Isolation requires some action on the part of a trial court to isolate that juror. For instance. So what about contributing to her duress? Did she say she was under duress? She said she was under duress, and I think it was appropriate for Judge Harmoning to inquire what that meant. If it's pressure under deliberations, that's not inappropriate. If it's some physical threat or someone is harming her, that is appropriate. And he wanted to make sure that if he's sending her back to deliberate, he's not sending her into a situation where she's at risk of harm. He didn't cut her off, counsel, because he said, she says, I mean, by the pressure in the room in there was, and then she's cut off and the judge says, well, let me ask you. And she says, well, not good. Well, that's because the private nature of the deliberations is not a proper issue for consideration. Once she says, I mean, the pressure in the room, that is an appropriate, that's something appropriate. That's something that happens in every jury trial where there is debate. So that's appropriate. Now he knows I'm not sending her into a hostile environment if I send her back to deliberate on this verdict. But he didn't send her back to deliberate, is my point. He did, Your Honor. Because he had to, the defense counsel didn't have their special interlocutors ready to send her back in the room to deliberate immediately. Well, they could have done it while they were deliberating. No, but they would have to be sent back into the jury room with fresh verdict forms, including a defense verdict form and fresh special interlocutors. The defense counsel did not have those ready available to proceed for continuation of deliberations. Those were not brought by defense counsel or plaintiff's counsel until the next hearing. Just making a copy of something, is it not? No, because they had been completed. Well, unsigned. No, no, no. That's incorrect, Your Honor. They were signed. There was a verdict form signed by Ms. McConaughey saying it was her verdict. There were special interlocutors signed by Ms. McConaughey. I understand, but there's clear, clean copies of those somewhere, are there not? No. No one had clean copies of the? No, the clean copies, the marked copies are made a part of the record. The clean copies are given to the jury. I understand how it works at trial, but there was no copy of those interlocutors and jury verdict forms that were not written on somewhere? No. Did everybody agree the jury should go home for the night? Was that an agreement of everybody at that point, that the jury should go home rather than continue deliberations that night? Yes, because defense counsel wanted to bring in writing their motion for mistrial. We wanted to bring in writing our position on why they should continue deliberations. So everybody, all counsel in the court agreed they should go home for the night and come back the next morning and figure out what to do? Correct, correct. And we came with our respective motions and clean verdict forms and special interlocutories. In case you won? In case the jury, both sides did, both sides did. And what do you think is the impact of having this overnight recess on the possible duress of the jury? I point to the Supreme Court decision of U.S. v. Carroll at 108 F. 3745, where I now quote the court, it was perfectly reasonable for the judge to conclude in these circumstances that bringing the jury back after a night's rest was appropriate. The possibility of coercion under these circumstances was de minimis. What case is that? U.S. v. Carroll at 108 F. 3745. It's a Seventh Circuit 1997 opinion. And in this case, it was the norm for the jury to be released at the end of the day. They had not finished their actions. They were released at the end of the day. And then they were returned to either be let go based upon mistrial or to continue deliberations. There was nothing abnormal about that whatsoever. All right, counsel, sum up the jury, please. Thank you. Finally, Your Honor, I would respectfully request that this court affirm the finding of the trial court and reinstate this jury in favor of the plaintiffs and against the defendants. Thank you, sir. Thank you. Five minutes. Just a few brief responses. First of all, with respect to the jury coercion, just to clarify, Jerome McConaghy's response was not equivocal. Her very first answer was, No, Your Honor, the verdict is not mine. Now, what counsel seems to be doing is creating ambiguity from the follow-up questioning. That doesn't make a lot of sense to suggest that ambiguity and the prolonged questioning about her dissent justified that prolonged questioning and isolating of her dissent. Did the city agree to come back the next day for deliberation? Well, to clarify for that, I mean, our position was that a mistrial should have been granted at that moment. We made a moral motion for a mistrial at that point. And really, it seemed like the judge at first was going that way, because also just to be clear, what the judge did say to the jury, and that's in the transcript at 1583, he told the jury he was going to talk to the attorneys for a moment and then relieve you of your jury duty. So then there was a back and forth with the attorneys, and the judge wanted to think about it, sleep on it, and come back the next day and decide. So just to clarify, that's how that progressed. Let's see. So there's really no questions. There was not any ambiguity during the congee's response in that the follow-up question emphasized that, including, I mean, the dialogue is laid out. Even when she responded to the question about whether the answer was voluntary, she said, you know, it was. It was. It wasn't in the beginning. We had to sign the paper at the end because we were told that we wouldn't leave that out of the room. Is it your voluntary verdict under duress? But the questioning goes on. And when she was asked about why she used the word duress and began to explain, she was interrupted. I mean, the point of polling is to allow the jurors to air the type of dissent and concerns that they can't inside the jury room. And here that would have worked if her dissenting, her original dissenting answer, you know, had been honored and the court had returned the jury to deliberations at that point. And just a couple more points on proximate cause. My opposing counsel mostly emphasized the Wilson-Rutten conduct and the pursuit, but you can have both of those things and still not have proximate causation. I haven't heard anything to explain any difference about the distance in between that conduct on 78th Street and the accident on State Street. And he pointed to some points in the record, and I would just emphasize the transcript at page 931 is where you will find the testimony about how the fleeing vehicle was four blocks ahead when it turned right onto State Street and out of view of the police officer. And the police officer's testimony is the only testimony on it. It is corroborated, of course, by a tape that is in the record, volume 17, at around page 88. You can, you know, listen to that and hear the light, you know, the sirens. You can't hear the lights, but you can hear the sirens, you know, after that point. So it is corroborated by that as well. So we do submit it once again. We ask that the judgment be reversed. And if there are no further questions, we ask that the judgment be reversed and judgment entered for the city or, in the alternative, a new trial granted. Thank you very much for your arguments here today. Well done, and you will be hearing from us. Thank you.